## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL D. STRICKLAND | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MAHONING TOWNSHIP;    MAHONING | : | NO. 08-cv-01570 |
| TOWNSHIP POLICE DEPARTMENT; | : | |
| FRANKLIN TOWNSHIP; CARBON COUNTY; | : | |
| OFFICER AUDIE M. MERTZ; POLICE CHIEF | : | |
| MARK ZENKO; OFFICER FRANK | : | |
| BUONAIUTO; ; RALPH FAHRINGER; | : | |
| JESSICA FAHRINGER | : | |

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS, MAHONING TOWNSHIP, OFFICER AUDIE M. MERTZ, AND POLICE CHIEF MARK ZENKO'S, MOTION FOR SUMMARY JUDGMENT

Defendants, Mahoning Township, Officer Audie M. Mertz, and Police Chief

Mark Zenko, (hereinafter referred to as "Moving Defendants"), by and through

their counsel, Weber Gallagher Simpson Stapleton Fires & Newby, LLP hereby

aver pursuant to Local Rule of Civil Procedure 56.1 that the following facts are not

in dispute and may be considered by the court in support of their Motion for

Summary Judgment:

1.      On Saturday, November 18, 2006, the Plaintiff and his brother, Craig

Strickland were asked by their friend, Rose, if they would help Rose return three

dogs to Ralph Fahringer, who sold the dogs to Rose the day before.  Rose needed

the help of Plaintiff and his brother to return the dogs because he could not do any lifting.  See Complaint at Docket Entry #1, ¶ 27.

2.  As the Plaintiff, Rose and Plaintiff's brother drove to the Fahringer home, Plaintiff fell asleep in the back seat.  See Complaint at Docket Entry #1 and Deposition Testimony of Mr. Samuel Strickland, p. 17 attached hereto as Exhibit A.

3.  When the three men arrived at the Fahringer house, the Plaintiff continued to sleep in the back of the car. However, after Plaintiff woke up, he was informed that Ralph Fahringer confronted Rose and Plaintiff's brother with a shotgun.  See Complaint at Docket Entry #1, ¶ 31.

4.  Plaintiff and his companions fled the scene and called 911 to report what had happened.  Id.

5.  Police from several townships, were told by the 911 operator that there was a man at the scene with a gun, and arrived shortly thereafter.  Id.; see also, Exhibit B[1], which is the affidavit of Officer Audie Mertz and Exhibit C, which is the deposition testimony of Officer Buonaiuto, p. 5.

6.  The police searched Plaintiff, his two companions and their vehicle for weapons.  Id. at ¶ 37; see also Exhibit B; Exhibit C, p. 6.

---

[1] This exhibit will be supplemented with an executed affidavit.

7.    The Plaintiff and his companions were detained while the police continued their investigation and questioning. Id. at ¶¶ 38 – 40; see also, Exhibit B, and Exhibit C, p. 8.

8.    Officer Buonaiuto and Officer Mertz asked the Plaintiff for his name and identification, and Plaintiff gave them the false name of Michael Andrews. Id. at ¶ 41; see also Exhibit A, p. 16-17, Exhibit B, and Exhibit C, p. 27-28, 30-31.

9.    After giving a false identification to the police, Plaintiff was arrested, handcuffed and placed in the back of a police vehicle. See Exhibit B, and Exhibit C, p. 27-28, 30-31.

10.    Officer Audie M. Mertz then interviewed the Fahringer's regarding the 911 call. See Exhibit B.

11.    During this time Plaintiff's companions were detained un-handcuffed. Id.

12.    Officer Mertz then contacted Assistant District Attorney Greek and conveyed to him the results of his investigation. See Exhibit B; Exhibit D [2], which is a true and correct copy of an affidavit executed by assistant District Attorney Greek, and Exhibit E which is a copy of the criminal complaint.

13.    Assistant District Attorney Greek than gave Officer Mertz approval to criminally charge the Plaintiff with providing a false identification to a law

---

[2] This exhibit will be supplemented with an executed affidavit.

enforcement officer, false reporting and criminal trespass.  <u>See</u> Complaint at Docket Entry #1, ¶ 43; <u>see</u> also Exhibit B, Exhibit D and Exhibit E.

14.    Assistant District Attorney Greek also gave Officer Mertz approval to arrest and charge the Plaintiff's companion, Mr. Rose. <u>See</u> Exhibit E

15.    The Plaintiff and his companion Rose were then jailed by the Mahoning Township Police. <u>See</u> Complaint a Docket Entry #1, ¶¶ 68-72.

16.    Plaintiff ultimately pled guilty to the criminal charges filed against him.  <u>Id</u>. at ¶ 74; <u>see</u> also, Exhibit A, p. 16-17, and Exhibit F which is a true and correct copy of the criminal dockets of <u>Commonwealth v. Strickland</u>.

17.    To date the Plaintiff has not produced any evidence to prove the allegations made in his Complaint.

18.    Plaintiff admits that he did not read his Complaint in full detail before he signed it. <u>See</u> Exhibit A, pp. 63-64.

19.    Plaintiff also admits that his complaint is not completely accurate. <u>Id.</u> at 103-104.

20.    The Plaintiff further admits he has no evidence that the practice or policies of Mahoning Township are racist and/or that he was arrested for any racist reasons. <u>Id</u>. at p. 108.

21.    In fact, Plaintiff admits that he has never read the practice and/or polices of Mahoning Township. <u>Id</u>.

22.    Plaintiff also admits that none of the officers at the scene said anything racially derogatory to him. Id. at p. 79-80.

23.    Plaintiff also has no knowledge of any of the training of any of the officers who arrived on the scene. Id. at 109-110.

24.    Plaintiff was also not on any medications at the time of his arrest or suffering from any physical ailments or conditions which required treatment. Id. at p. 35

25.    The Plaintiff also did not suffer any physical injuries while he was incarcerated at CCCF. Id. at p. 34.

26.    Thus, for the foregoing reasons set forth in Moving Defendants' Motion for Summary Judgment and Memorandum of Law, Plaintiff's Complaint should be dismissed for failure to prove all Counts of his Complaint.

**Respectfully submitted,**

WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY, LLP

By:        /s/ Wendi Barish, Esquire
           Joseph Goldberg, Esquire
           Attorney ID: 21376
           jgolberg@wglaw.com
           Syreeta Peake, Esquire
           Attorney ID: 201327
           speake@wglaw.com
           2000 Market Street, 13th Floor
           Philadelphia, PA  19103
           (215) 972-7900
Date:  November 29, 2009    Fax: (215) 564-7699

## CERTIFICATION OF SERVICE

I, Wendi Barish, Esquire, hereby certify that a true and correct copy of *Defendants', Mahoning Township, Officer Audie M. Mertz, and Police Chief Mark Zenko's Statement of Undisputed Facts in Support of Their Summary Judgment Motion* was served in accordance with the Notice of Electronic Filing upon the following interested parties:

Mr. Samuel D. Strickland
227 N. 15th Street
Allentown, PA  18102

Ralph and Jessica Fahringer
418 Fritz Drive
Lehighton, PA  18235

Gerard J. Geiger, Esquire
Newman, Williams, Mushkin,
Corveleyn, Wolfe & Fareri, P.C.
712 Monroe Street
P. O. Box 511
Stroudsburg, PA  18360-0511

Matthew Kline, Esquire
Siana Bellwoar & McAndrew, LLP
941 Pottstown Pike
Suite 200
Chester Springs, PA 19425

Date: <u>November 29, 2009</u>

<u>/s/ Wendi Barish, Esquire</u>
WENDI BARISH

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

SAMUEL D. STRICKLAND                         :
                                             :
                                             :
     -vs-                                     :   3:08-CV-01570
                                             :
                                             :
MAHONING TOWNSHIP, MAHONING                   :
TOWNSHIP POLICE DEPARTMENT,                   :
FRANKLIN TOWNSHIP, CARBON                     :
COUNTY, OFFICER AUDIE M.                      :
MERTZ, POLICE CHIEF MARK                      :
ZENKO, BRUCE L. KEIPER,                       :
CHARLES R. EIDEM, DAWN L.                     :
BLOCKER, PATRICIA SNYDER,                     :
GEORGE STAWNYCZYJ, OFFICER                    :
FRANK BUONAIUTO, ROD GREEN,                   :
LARRY SMITH, PAUL KOCHER and                  :
RALPH AND JESSICA FAHRINGER                   :

---

### DEPOSITION OF SAMUEL D. STRICKLAND

taken on behalf of Defendant Carbon County, at the law

offices of Newman, Willliams, Mishkin, Corveleyn, Wolfe &

Fareri, P.C., 712 Monroe Street, Stroudsburg, Pennsylvania,

on Monday, October 5, 2009, beginning at 1:26 p.m., before

Josephine Hollman, Court Reporter and Notary Public.

---

COPY

---

**PANKO REPORTING**
537 Sarah Street, 2nd Floor
Stroudsburg, PA   18360
(570) 421-3620

Samuel Strickland                    16

1    A.    I know what I was charged with.  I don't know

2    what he said in respect to that, but I would

3    imagine he did --

4    Q.    What were you --

5    A.    -- because he set bail for us, sir.

6    Q.    What were you charged with?

7    A.    If I'm not mistaken it was trespassing and

8    giving false identification.

9    Q.    Giving false identification to a police

10   officer?

11   A.    Yes, sir.

12   Q.    Did you give false identification to a police

13   officer?

14   A.    Yes, I did, sir.

15   Q.    What identification did you give to the police

16   officer?

17   A.    Michael Andrews.

18   Q.    In other words, you told the police officer

19   your name was Michael Andrews?

20   A.    Yes, sir.

21   Q.    And that's A-n-d-r-e-w-s?

22   A.    Yes, sir.

23   Q.    Why did you do that?

24   A.    Because I was -- wasn't even focusing, sir.

25   I'd been drinking all the night before, I was

Samuel Strickland                    17

1   startled when it all went down.  I didn't know what
2   was going on.  All I know I was being pulled out of
3   a car and I wasn't in the right frame of mind at
4   the time, you know, just didn't understand what was
5   going on.
6   Q.    Were you under the influence of alcohol at the
7   time of the arrest?
8   A.    Yes, I was.
9   Q.    How much did you have to drink before the
10  arrest?
11  A.    I would say about six pack.
12  Q.    Can you give us a time frame as to when you
13  had the six pack?
14  A.    Excuse me?
15  Q.    When did you drink the six pack of beer?
16  A.    Prior to coming up -- prior to coming to
17  Carbon County.
18  Q.    When did you get to the Fahringer's house,
19  about what time?
20  A.    I really wouldn't know.  I was -- by the time
21  I got there I was asleep.  I really don't know what
22  time it was.  All I know is when the situation --
23  by the time the police got there I was waking up as
24  far as I know.
25  Q.    I was going to ask you this later, but let me

Samuel Strickland                                    34

1    A.    He was there.  I wouldn't know.  I know he was

2    being processed, I was being processed.  Whether

3    they were processing us both at the same time I

4    couldn't answer that.

5    Q.    Now, did you suffer any injuries while you

6    were an inmate at the jail?

7    A.    Physical injuries?

8    Q.    Physical injuries.

9    A.    No, sir.

10   Q.    Did you suffer any emotional injuries from

11   being in the jail?

12   A.    I felt intimated, sir.

13   Q.    By any --

14   A.    I felt threatened.

15   Q.    By any specific people?

16   A.    By the people within my cell.  I just felt

17   like I was in the wrong place.  They wasn't -- I

18   didn't have no type of comradery, you know, it just

19   -- I felt like I was about to -- something was

20   about to happen to me at any point in time.

21   Q.    Did any of those cellmates threaten you?

22   A.    They made racial slurs, put it that way.  They

23   made racial slurs.

24   Q.    Do you remember what they said?

25   A.    Not specifically.  Something along the lines

Samuel Strickland                    35

1  of -- it was just a very uncomfortable situation.

2  Knowing jail is not built for comfort, but within

3  my cell, the other three gentlemen that was in the

4  cell with me, it just didn't feel real comfortable.

5  I felt --

6  Q.    But do you remember any words that they used?

7  You say racial slurs, but I'm asking specific

8  words.   Do you recall those?

9  A.    No, sir.

10 Q.    At any time other than saying racial slurs did

11 any of them threaten to harm you?

12 A.    No, sir.

13 Q.    Did you report any of these racial slurs to

14 any officers at the jail?

15 A.    No, sir, I just was abiding my time trying to

16 wait to get out of there.

17 Q.    Okay.  Were you on any medication when you

18 were brought into the jail?

19 A.    No, sir.

20 Q.    Were you suffering from -- do you have any

21 injuries or suffering from any medical conditions

22 when you were brought in?

23 A.    No, sir.

24 Q.    And I usually ask this at the beginning of the

25 deposition, but are you taking any medication now?

Samuel Strickland                    63

1   Couldn't answer that.

2                   MR. GEIGER:  All right.  I'm

3   going to turn the questioning over to whichever one

4   of you wants to go next.

5                   MS. BARISH:  I'll go.

6   BY MS. BARISH:

7   Q.    Mr. Strickland, I represent Mahoning Township

8   and Officers Mertz and Chief Zenko, they're named

9   defendants.

10  A.    Officer who?

11  Q.    Officer Mertz.

12  A.    And?

13  Q.    Chief Zenko.  They're two of the people that

14  you have --

15                  MS. BARISH:  Do you have that

16  complaint next to you?

17                  MALE VOICE:  Yeah.

18  BY MS. BARISH:

19  Q.    I'm just going to show you the complaint that

20  you filed.

21        Is this your signature that's on -- it's not a

22  numbered page, but at the end of the complaint,

23  almost the last page, is that your signature?

24  A.    Yes, it is.

25  Q.    Have you seen this complaint before you signed

1    it?

2    A.    I probably briefed through it.  I didn't read

3    it in full detail.

4    Q.    Okay.  How did you come to see this complaint?

5    A.    Mr. Anthony brought it to my attention.

6    Q.    Do you remember, were you in his office at the

7    time?

8    A.    Yes.

9    Q.    Okay.  What did he say to you when he gave you

10   the complaint?

11   A.    I have some things for you to sign so I can

12   get this out basically is what he said.

13   Q.    Did he ask you to make sure that the

14   information in the complaint was truthful?

15   A.    Meaning?

16   Q.    Did he ask you to read it and make sure that

17   everything was truthful in here and --

18   A.    Not really, he just said I have some things

19   for to you sign.  I was basically trusting him

20   that, you know what I'm saying, that what he was

21   writing was correct.

22   Q.    Well, did you have a meeting with him before

23   then to explain to him?  Like how would he get the

24   information that was in here?

25   A.    Well, he -- we sat down, he asked me some

Samuel Strickland                                            79

1    up at that point.

2    Q.    Okay.  I'm just trying to understand all the

3    reasons why you think this happened because of your

4    race.  And I thought you had said he had made the

5    call, so I don't know if you knew that at the time

6    you were pulled out of the car, though.

7         Was it simply the fact that you were pulled

8    out of the car that made you believe it was due to

9    your race?

10   A.    I didn't know why I was being pulled out the

11   car, so I did not know why I was being pulled out

12   the car.  Why I was taken out of the car and put in

13   the back of the police car, for what reason I did

14   not know.

15   Q.    Okay.  But at some point you formed the

16   opinion that it was due to your race?

17   A.    Yes.

18   Q.    Okay.  Did anyone say anything on the scene

19   that was racially derogatory that made you reach

20   that conclusion, any of the officers on the scene?

21   A.    Not directly, no.

22   Q.    Did they say something indirectly?

23   A.    Not directly, no.

24   Q.    Well, what do you mean directly?

25   A.    They did not directly say something to me

Samuel Strickland                    80

1   racially.

2   Q.    Did you observe them do anything or say

3   anything to anyone else that was racial?

4   A.    Did I who?

5   Q.    Did you observe them do anything or say

6   anything to someone else that led you to believe

7   that it was racially motivated?

8   A.    Just the whole situation itself led me to

9   believe that it was racially motivated.  Just the

10  whole -- the whole situation, the way the whole

11  thing was handled.

12  Q.    Okay.  I'm just trying to fully understand why

13  you reached that opinion.

14  A.    Just the whole -- the way the whole thing was

15  handled led me to believe that.

16  Q.    Can be a little more specific about that?

17  What was it that happened that made you think that?

18  A.    Well, I was taken out of the car for no

19  apparent reason and put back in the police car for

20  no apparent reason.  What did I do to make them put

21  me in the back of the police car?  Why was I put in

22  the back of the police car?

23  Q.    Okay.  I want to show you a copy of what we

24  were given as being your answers to

25  interrogatories.  At some point in time the

Samuel Strickland                          103

1    Q.    Okay.  I mean, isn't that -- I'm sorry.  I
2    don't want to cut you off.
3    A.    Go ahead.
4    Q.    Isn't that more like a plea bargain, you're
5    being forced -- you're cutting a deal saying I'll
6    enter a guilty plea to one charge so the rest of it
7    gets thrown out and I don't go to jail?  You know,
8    you tell me if I'm wrong.  Isn't that the way it
9    works?
10   A.    Man, I don't know.  I really don't know how it
11   works.
12   Q.    Okay.  Ms. Barish asked you a little bit about
13   this, this thing was drafted -- this complaint,
14   excuse me, was drafted by Tom Anthony?
15   A.    Yes, sir.
16   Q.    And you said you read some of it before it was
17   filed?
18   A.    Yes, sir.
19   Q.    Can we agree --
20   A.    Briefly.
21   Q.    I'm sorry?
22   A.    Briefly.
23   Q.    Briefly.  Okay.
24         Can we agree as we sit here today that there
25   are things in here that aren't accurate?

Samuel Strickland                    104

1    A.    Well, I -- it's possible.  It's possible.  I

2    wouldn't doubt it.  It's possible, you know.  But

3    for the most part it's -- I would imagine that

4    they're accurate for the most part.  I mean, I

5    wouldn't say everything is 100 percent solid.  I'm

6    quite sure there's a few flaws and discrepancies in

7    it.  Not exactly accurate, but for the most part it

8    is I would think.  I would like to think so.

9    Q.    Mr. Strickland, there are references in the

10   complaint to excessive force.  And from what you

11   told us today in answers to your questions --

12   A.    Excess force?

13   Q.    Excessive force.  I'm not hearing that there

14   was any force used at all.

15   A.    I have no complaint about excessive force.  I

16   was not physically handled in any --

17   Q.    We can agree no one shoved you, punched you,

18   kicked you --

19   A.    Exactly.  Nah, nah.

20   Q.    Can we agree to that?

21   A.    Yes, sir.  Yes, sir.

22   Q.    You think that's maybe language thrown in by

23   Mr. Anthony?

24   A.    I would imagine so, sir.  Not to try to make

25   light or nothing but I would imagine so.

Samuel Strickland                    108

1    would be acting under their guidelines.

2    Q.    Okay.  Yeah, I don't think we're disagreeing

3    on that point.  Officers, generally, in certain

4    townships, have rules and guidelines they have to

5    follow.

6    A.    Right.  Right.

7    Q.    We're not here to argue about that.  But what

8    I'm asking you is, you can't sit here and say those

9    policies are racist or those policies are improper,

10   even if we don't say racist, are improper, you

11   never read them, you don't even know what's in the

12   policies, correct?

13   A.    Correct.

14   Q.    Okay.

15   A.    Correct.

16   Q.    I'm glad we had this discussion.  That's where

17   I was going.

18        Okay.  Similar question regarding a lack of

19   training.  You don't know how Officer Buonaiuto was

20   trained or not trained, correct?

21   A.    I wasn't there when he went through his

22   training if that's what you're asking me.  I mean,

23   I wasn't there.

24   Q.    I understand you weren't there when he went

25   through his training.  You make a reference in your

Samuel Strickland                                    109

1    complaint to a lack of training regarding Mertz and

2    Buonaiuto.

3         You don't know if there's a lack of training

4    for those guys, isn't that correct?

5    A.    That's a question that can go one way or the

6    other because I might not know what -- my

7    statements are made upon interacting with them, you

8    know what I mean?  So, in other words, by their

9    actions comes my reaction, do you understand what

10   I'm saying?

11   Q.    I think so.  I don't want to cut you off.  Are

12   you done with your answer?

13   A.    Yes, sir.

14   Q.    I just want to ask a follow-up question.

15        Now, I understand earlier you told me, you

16   know, that your personal opinion about the way this

17   entire incident occurred.

18   A.    Uh-huh.  Yes, sir.

19   Q.    You gave your personal opinion.  Now, what I'm

20   asking you now is you interacted with certain

21   officers that day, and is it your personal opinion,

22   based on that interaction, that there could be a

23   lack of training versus you don't know whether

24   there was or was not?

25   A.    My personal opinion, yes, there could be a

Samuel Strickland                    110

1  lack of training.

2  Q.   It's your opinion that there could be a lack

3  of training?

4  A.   Yes, sir.

5  Q.   So what's in the complaint regarding lack of

6  training is not based on your knowledge of how much

7  training occurred, what the specific --

8  A.   Oh, I don't know exactly how much training

9  they had or how much training they have lack of,

10 no, I don't.

11                    (Brief interruption to allow

12 court reporter's change of paper.)

13 BY MR. KLINE:

14 Q.   Now, Mr. Strickland, I think this was covered

15 before by Ms. Barish, but in terms of the actual

16 events as they went down that are referenced in the

17 complaint, this stuff is based upon not your

18 personal knowledge but information maybe from James

19 Rose or from Craig Strickland?  For example,

20 Fahringer yelled to Rose, quote, just put the dogs

21 in the driveway and get the F, I'll say, off my

22 property.

23 A.   I didn't witness none of this, sir.

24 Q.   Okay.  Paragraph 31, subparagraph F, less than

25 20 seconds after Rose got off the phone with the

116

1    p.m.)

2                              ---

3

4

5

6

7                    I, Josephine Hollman, a Notary

8    Public of the Commonwealth of Pennsylvania, do

9    hereby certify that the foregoing is a true and

10   correct transcript, recorded stenographically by

11   me, of the deposition of SAMUEL D. STRICKLAND, who

12   was first duly sworn by me.

13                   I further certify that I am

14   neither counsel nor solicitor to any of the parties

15   in said suit; nor interested in the event of the

16   cause.

17

18

19        _____

20        JOSEPHINE HOLLMAN, C.R.

21

22

23

24

25

1          I have read the foregoing transcript of

2     my deposition, and except as to any corrections

3     noted below, the same is true and correct.

4

5

6

7                                    _____

8                                    SAMUEL D. STRICKLAND

9

10

11

12     Page    Line          Corrections              Reason

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

**( To be supplemented )**

# EXHIBIT C

IN THE US DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JAMES E. ROSE, JR.,
     Plaintiff

                           No.  3:CV-07-1305

     VS.


MAHONING TOWNSHIP;
CARBON COUNTY; OFFICER AUDIE M.
MERTZ; POLICE CHIEF MARK ZENKO;
JEAN A. ENGLER; BRUCE L. KEIPER;
CHARLES R. EIDEM; DAWN L. BLOCKER;
PATRICIA SNYDER; GEORGE STAWNYCZYJ;
OFFICER KEITH R. GEHRING; OFFICER
MATTHEW ARNER; OFFICER FRANK BUONAIUTO;
and RALPH and JESSICA FAHRINGER,
     Defendants

- - -



    Deposition of OFFICER FRANK BUONAIUTO, taken at

the Lehigh County Bar Association, 1114 West Walnut

Street, Allentown, Pennsylvania, on Friday, August 28,

2009 commencing at or about 11:20 a.m., before Bonnie

Becker, RPR, Registered Professional Reporter of the

Commonwealth of Pennsylvania.


- - -


FRANCES GUNKEL, RPR, & ASSOCIATES
FREELANCE COURT REPORTERS
43 HIGH SADDLE LANE
ALLENTOWN, PENNSYLVANIA 18104
(610) 366-8996

1    Q.    What were you told about the incident at 418

2    Fritz Drive while enroute to the location?

3    A.    The initial dispatch came over to Officer Mertz.

4    I overheard the dispatch.  I received the dispatch from

5    COM to assist Mahoning Township.  It was just from what

6    I recall it was trespassing and the males had guns or

7    possible weapons.

8    Q.    Was there any indication that the males were

9    black?

10    A.    Not that I recall.

11    Q.    Who was the dispatcher?

12    A.    I don't know the dispatcher nor their number.

13    Q.    Who asked you to assist them?

14    A.    Carbon County, one of the dispatchers.

15    Q.    Who was the officer in charge?

16    A.    Officer Mertz.

17    Q.    What did you do at the scene when you got there?

18    A.    Officer Mertz, to assist Officer Mertz whatever

19    he needed.

20    Q.    What did that consist of?

21    A.    Information gathering.

22    Q.    So when you got to the scene, what did you do?

23    A.    I assisted Officer Mertz until he gave me

24    instructions to do whatever I needed to do.  It was just

25    information gathering.  I think I had to get names.

1    Q.    So Officer Mertz spearheaded this investigation?

2         MR. GERBER:    Objection to the form.  Answer if

3    you understand.

4         THE WITNESS:    As he was in charge?

5    BY MR. ROSE:

6    Q.    Yes.

7    A.    Yes, he was in charge.

8    Q.    So if you were not asked by Carbon County

9    dispatcher, you would never have been there; is that

10   correct?

11   A.    Correct.

12   Q.    Did Officer Mertz instruct you to search me and

13   my two companions?

14   A.    I know they were patted down for weapons.  As to

15   who did that, I am unsure.

16   Q.    Now that was not the question.  Did Officer

17   Mertz tell you to search for weapons?

18   A.    No.

19   Q.    Who did?

20        MR. GERBER:    Objection to the form.

21        MR. GOLDBERG:    Who did what, who gave the

22   instructions or who did the search?

23        MR. ROSE:    Who gave the instructions?

24        MR. GERBER:    It assumes instructions were given.

25   Objection to the question.

1    question if you understand it.

2    BY MR. ROSE:

3        Q.    He is just objecting for the record.

4        A.    No.

5        Q.    How long have you known Officer Mertz?

6        A.    This is 2009, approximately 10 years.

7        Q.    You know a lot about him?

8        A.    Not a lot about him.  I know he is a police

9    officer.  He was one of my friends.

10       Q.    So when you say he is one of your friends, is it

11   an associate as a police officer or a friend that you go

12   out and drink and have beers with?

13       A.    Associate as a police officer.

14       Q.    But you don't have beers with him or anything

15   like that?

16       A.    No, no.

17       Q.    Do you know if whether or not Officer Mertz that

18   evening questioned me?

19       A.    I am not -- yes, he did.

20       Q.    When?

21       A.    It wasn't questioning as interrogation or

22   anything like that.  It was just to find out what was

23   going on as to what the events leading up to everything

24   that happened that evening.

25       Q.    Are you sure that is your recollection?

1  allowed to; nobody told you that you were not allowed to

2  sit down.

3  BY MR. ROSE:

4     Q.   Where were we going to sit?

5        MR. GOLDBERG:  Objection.

6        MR. GERBER:  Objection, it is argumentative.

7  Wait for the next question.

8  BY MR. ROSE:

9     Q.   Did you provide an area for me and the two

10  Stricklands to have a seat?

11     A.   No, there was nowhere to sit.

12     Q.   How about your police car?

13     A.   Yes, I mean, anybody can sit in the police car.

14  Not, anybody, but...

15     Q.   Did you offer any of us to sit in the police

16  car?

17     A.   I know you sat in my police car.

18     Q.   How about the Stricklands?

19     A.   I think Sam was sitting in the police car, too.

20     Q.   Did you order him to sit in the police car -- at

21  what point did you handcuff Sam Strickland?

22     A.   I didn't handcuff Sam Strickland.

23     Q.   Who did?

24     A.   Officer Mertz.

25     Q.   When did he handcuff Sam Strickland?

1    A.    After he gave the false name.

2    Q.    Was that after he returned back from the

3    Fahringers?

4    A.    I don't recall.  I don't know.  It had to be

5    after, yes, it was after.

6    Q.    Would you lie for Officer Mertz?

7    A.    Absolutely not.

8    Q.    Would you protect him?

9    A.    Absolutely not.

10    Q.    Did you search Sam Strickland for weapons?

11    A.    Prior to him going to my car, yes, I patted him

12    down for weapons.

13    Q.    Did you search Greg Strickland for weapons?

14    A.    Another officer did that, I am not sure who.

15    Q.    Did you search the vehicle, my vehicle?

16    A.    No, I did not.  It was not me.  It was another

17    officer.

18    Q.    Do you know if whether or not any of the other

19    officers found any weapons?

20         MR. GERBER:    Asked and answered, Mr. Rose.

21         MR. ROSE:  It was?

22         MR. GERBER:  Yes, I am going to let him answer

23    but at some point I am going to have to draw the line.

24         THE WITNESS:  Repeat the question.

25    BY MR. ROSE:

1    A.    I think he was allowed to sit there.

2    Q.    I heard you say that Sam Strickland gave a false

3    name?

4    A.    Correct.

5    Q.    Tell me what you remember about that.

6    A.    Mr. Strickland was asked his name outside the

7    car.  Prior to that he was talking and I overheard him

8    say he was in the military.  When he was asked his name

9    -- after that conversation he was asked his name.  I

10    asked him his name.  Officer Mertz said, get their

11    names, I said I will get their names.

12    I went over to Mr. Strickland and got his name.

13    Mr. Strickland gave me a false name.  I gave that false

14    name to Officer Mertz.  Officer Mertz then went to his

15    patrol car, accessed Jaynet and ran the name.  The name

16    came back no record found.

17    I asked him again what is your name, clarified

18    the spelling of it to make sure I interpreted it

19    correctly.  Went back to the patrol car.  His name was

20    not given; it came back no record found.

21    Mr. Strickland was just placed into my car in

22    handcuffs.  When I placed him into my car, Officer Mertz

23    was still on the computer trying to access the name.

24    I sat in my patrol car.  At that time Mr. Strickland

25    said, I will tell you my name.

1    The real name was then supplied to Officer Mertz.

2    Officer Mertz accessed Jaynet like I stated, found Mr.

3    Strickland along with a positive ID of a photograph of

4    Mr. Strickland.  That was given to me.  Audie or

5    Officer Mertz left the patrol car, placed Mr. Strickland

6    into his custody and that time Mr. Rose was allowed to

7    sit in my car.

8    Q.    Am I correct, Officer, that providing false

9    identification to law enforcement is a felony?

10    A.    Correct.

11    MR. GOLDBERG:  No further questions.

12    EXAMINATION BY MR. KIDWELL:

13    Q.    Officer, were you responsible for transporting

14    Mr. Rose to the Carbon County Prison on the night in

15    question?

16    A.    No.

17    EXAMINATION BY MR. ROSE:

18    Q.    Is it your testimony that you were assisting

19    Officer Mertz?

20    A.    Yes.

21    Q.    It is your testimony that Officer Mertz spent a

22    great deal of time down at the scene with yourself and

23    the Stricklands and myself?

24    MR. GERBER:  Objection to the form.  Mr. Rose, he

25    has already answered numerous questions about the time

082809b

I have read the foregoing transcript of my deposition, and except as to any changes noted below, the same is true and correct.

_____
OFFICER FRANK BUONAIUTO

Page    Line        Change                          Reason

# EXHIBIT D

## ( To be supplemented )

# EXHIBIT E

# COMMONWEALTH OF PENNSYLVANIA
COUNTY OF: _____CARBON_____

## POLICE
## CRIMINAL COMPLAINT

Magisterial District Number: 56-3-01

MDJ Name: Hon. EDWARD M. LEWIS

Address: 340 CENTER AVENUE
P.O. BOX 356
JIM THORPE PA 18229

Telephone: ( ) 570-325-2751

### COMMONWEALTH OF PENNSYLVANIA
VS.
**DEFENDANT:**

Docket No.:

Date Filed: 11/18/2006

OTN:

| NAME and ADDRESS |
|---|
| SAMUEL D STRICKLAND
2529 NORTH 17 STREET
PHILADELPHIA PA 19132 |

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B. | Defendant's Social Security Number | Defendant's SID (State Identification Number) |
|---|---|---|---|---|
| ☐ White  ☒ Black
☐ Asian  ☐ Native American
☐ Hispanic  ☐ Unknown | ☐ Female
☒ Male | 09/01/1960 | 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 | |

| Defendant's A.K.A. (also known as) | Defendant's Vehicle Information
Plate Number      State Registration Sticker (MM/YY) | Defendant's Driver's License Number
State |
|---|---|---|
| | | PA  20424355 |

| Complaint/Incident Number | LiveScan Tracking Number | Complaint/Incident Number if other Participants | UCR/NIBRS Code |
|---|---|---|---|
| 20061118M9163 | | | 2624/90Z |

Office of the Attorney for the Commonwealth ☒ Approved ☐ Disapproved because: VIA PHONE

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. Pa.R.Crim.P. 507.)

ADA GREEK                                                                                    11/18/2006

(Name of Attorney for Commonwealth-Please Print or Type)    (Signature of Attorney for Commonwealth)    (Date)

I, PO AUDIE MERTZ                                          3020
(Name of Affiant-Please Print or Type)                    (Officer Badge Number/I.D.)

of MAHONING TOWNSHIP POLICE DEPARTMENT    PA0131000    20061118M9163
(Identify Department or Agency Represented and Political Subdivision)  (Police Agency or ORI Number)  (Originating Agency Case Number (OCA))

do hereby state: (check appropriate box)

1.  ☒ I accuse the above named defendant who lives at the address set forth above
    ☐ I accuse the defendant whose name is unknown to me but who is described as _____

    ☐ I accuse the the defendant whose name and popular designation or nickname is unknown to me and whom I have therefore designated as John Doe

with violating the penal laws of the Commonwealth of Pennsylvania at _____
(Place-Political Subdivision)

    418 FRITZ DR LEHIGHTON

in CARBON                County on or about 18 November 2006 at approx. 16:53 hr.

Participants were: (if there were participants, place their names here, repeating the name of the above defendant)

STRICKLAND, SAMUEL D, CRAIG STRICKLAND, AND ROSE JR, JIMI EDWARD

AOPC 412A-05

| Defendant's Name: | SAMUEL D STRICKLAND |
|---|---|
| Docket Number: | |



**POLICE
CRIMINAL COMPLAINT**

2.  **The acts committed by the accused were:**
(Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged. A citation to the statute allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)

COUNT #1 FALSE REPORTS TO LAW ENFORCEMENT AUTHORITIES (M2)  In that the actor,
knowingly gave false information, to a law enforcement officer, with intent to
implicate another in violation of Section 4906(a) of the Pennsylvania Crimes Code.

COUNT #2 FALSE IDENTIFICATION TO LAW ENFORCEMENT AUTHORITIES (M3)  In that the actor
did furnish law enforcement authorities with false information about his identity
after being informed by a law enforcement officer who is in uniform or who has
identified himself as a law enforcement that the person is the subject of an official
investigation of a violation of law.

COUNT-#3 CRIMINAL TRESPASS (SO)  In that the actor, knowing that he was not licensed
or privileged to do so, entered or remained in any place for the purpose of:
threatening or terrorizing the owner or occupant of the premises.

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of
Assembly,  or in violation of

| | Section | Subsection | | PA Statute | counts |
|---|---|---|---|---|---|
| 1. | 4906 | A | of the | 18 | 1 |
| 2. | 4914 | A | of the | 18 | 1 |
| 3. | 3503 | B1i | of the | 18 | 1 |
| 4. | | | of the | | |

3.  I ask that a warrant or a summons be issued and that the defendant be required to answer the charges I
have made.  **(In order for a warrant of arrest to issue, the attached affidavit of probable cause must be
completed and sworn to before the issuing authority.)**

4.  I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and
belief.  This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA C.C. 4904)
relating to unsworn falsification to authorities.

_____ , _____ .                                    _____
                                                                (Signature of Affiant)

AND NOW, on this date _____, _____ I certify that the complaint has been properly completed and verified. An
affidavit of probable cause must be completed in order for a warrant to issue.

_____              _____                    **SEAL**
        (Magisterial District)                          (Issuing Authority)

AOPC 412B-05      11/18/2006 21:51:28

| Defendant's Name: SAMUEL D STRICKLAND |  | **POLICE** |
| Docket Number: | | **CRIMINAL COMPLAINT** |

## AFFIDAVIT OF PROBABLE CAUSE

ON LISTED DATE AND TIME DISPATCHED TO LISTED RESIDENCE FOR A REPORT OF PERSONS
AT THE RESIDENCE THREATENING TO SHOOT SOMEONE'S HEAD OFF. UPON ARRIVAL THE
FOLLOWING INFORMATION WAS OBTAINED. RALPH FAHRINGER RESIDENT OF LISTED ADDRESS
RELATED THAT HE HAD SOLD THREE DOGS TO THE DEFENDANT JIMI EDWARD ROSE JR
YESTERDAY. HE RELATED THAT JIMI CALLED HIM EARLIER THIS DATE AND STATED THAT HE
WANTED A REFUND FOR THE DOGS THAT HE DID NOT GET THE PICK OF THE LITTER. HE
RELATED THAT HE TOLD JIMI THAT HE DID NOT GIVE REFUNDS AND WOULD NOT GIVE A
REFUND TO JIMI AT WHICH TIME JIMI STATED HE WOULD COME BLOW RALPHS HEAD OFF AT
WHICH TIME RALPH TOLD JIMI THAT HIS DOGS WOULD BITE OFF HIS HEAD. RALPH RELATED
THAT HE WAS INSIDE HIS HOME WITH HIS WIFE AND CHILDREN WHEN HE NOTED JIMIS
VEHICLE PULL INTO HIS DRIVEWAY. AT WHICH TIME A MALE PASSENGER EXITED THE
VEHICLE AND CAME UP TO THE EDGE OF THE PORCH. RALPH RELATED THAT HE STAYED
INSIDE HIS HOUSE AND THE MALE LATER IDENTIFIED AS CRAIG STRICKLAND GOT OUT OF
THE PASSENGER FRONT SEAT AND APPROACHED THE EDGE OF THE PORCH. RALPH RELATED
THAT CRAIG ASKED FOR THE GUY THAT SOLD THE DOGS AND HE TOLD HIM THAT HE WAS THE
PERSON. RALPH RELATED THAT JIMI THEN STARTED TO YELL FROM THE VEHICLE AND TOLD
HIM TO COME DOWN. RALPH RELATED THAT HE RESPONDED NO HE AINT STUPID TELLING
THEM TO LEAVE. AT WHICH TIME JIMI GOT OUT OF THE VEHICLE AND TOLD HIM TO COME
OUT OF THE FUCKING HOUSE THAT HE WAS GOING TO GET HIS MONEY RALPH RELATED THAT
AFTER HE GOT OUT OF THE VEHICLE HE PUT HIS HAND IN HIS POCKET. RALPH RELATED
THAT HE THEN PULLED OUT HIS GUN AT WHICH TIME JIMI AND CRAIG GOT BACK INTO THE
VEHICLE AND PULLED OUT OF HIS DRIVEWAY DRIVING DOWN THE STREET. RALPH RELATED
THAT THEY TURNED AROUND CAME BACK AND PARKED IN THE STREET.

UPON INITIAL ARRIVAL TO THE SCENE I MADE CONTACT WITH THE VEHICLES OCCUPANTS
OBTAINING DRIVERS LICENSE INFORMATION FROM JIMI EDWARD ROSE JR, AND CRAIG
STRICKLAND. THE THIRD MALE RELATED THAT HE DID NOT HAVE HIS DRIVER LICENSE OR
ANY FORM OF ID WITH HIM. HE RELATED THAT HIS NAME WAS MICHAEL ANDREWS,
DOB-12/19/1961, ADDRESS 321 NORTH FOURTH STREET ALLENTOWN, PA. A CHECK OF JNET
CONFIRMED THE IDENTITY OF JIMI, AND CRAIG. UPON PULLING UP MICHAEL ANDREWS
LICENSE INFORMATION I IMMEDIATELY REALIZED THAT THE PHOTOGRAPH FOR MICHAEL
ANDREWS DID NOT MATCH THE PERSON I WAS SPEAKING WITH. I WENT BACK AND ASKED HIM

(Continued)

I, PO AUDIE MERTZ                              3020                              , BEING DULY SWORN

ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FORGOING AFFIDAVIT ARE

TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, _____.

_____, Magisterial District Judge

My commission expires first Monday of January, _____          **SEAL**

AOPC 412C-05

| Defendant's Name:  SAMUEL D STRICKLAND |  | **POLICE** |
|---|---|---|
| Docket Number: | | **CRIMINAL COMPLAINT** |

## AFFIDAVIT OF PROBABLE CAUSE

FOR HIS SS# AND HE RELATED THAT HE DID NOT KNOW IT.  I THEN ASKED WHEN HE HAD
HIS LAST PHOTO TAKEN AND WHAT CLASS HIS LICENSE WAS.  HE RELATED THAT HE DID NOT
REMEMBER WHEN HIS PHOTO WAS TAKEN BUT HE HAD GLASSES ON FOR THE PHOTO AND HE HAD
A CLASS C LICENSE.  AT WHICH TIME HE WAS CONFRONTED WITH THE FALSE
IDENTIFICATION AND HE STATED THAT HE GAVE THE FALSE INFORMATION BECAUSE HE IS
INVOLVED IN DOMESTICS.  AT WHICH TIME HE WAS POSITIVELY IDENTIFIED AS SAMUEL D.
STRICKLAND DOB 09/01/1960.

I, PO AUDIE MERTZ                    3020                    , BEING DULY SWORN

ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FORGOING AFFIDAVIT ARE

TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE,INFORMATION,AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____, _____

_____, Magisterial District Judge

My commission expires first Monday of January, _____          **SEAL**

AOPC 412C-05

# EXHIBIT F



# COURT OF COMMON PLEAS OF CARBON COUNTY

## DOCKET

**Docket Number: CP-13-CR-0000098-2007**

# CRIMINAL DOCKET

**M3 Disposed by Lower Court**

Commonwealth of Pennsylvania

v.

Samuel D. Strickland

Page 1 of 4

## CASE INFORMATION

Judge Assigned: Nanovic, Roger N.

OTN: K5310922

Initial Issuing Authority: Edward M. Lewis

Arresting Agency: Mahoning Twp Police Dept

Case Local Number Type(s)

Date Filed: 02/01/2007          Initiation Date: 02/01/2007

Lower Court Docket No: CR-0000324-06

Final Issuing Authority: Edward M. Lewis

Arresting Officer: Mertz, Audie M.

Case Local Number(s)

## STATUS INFORMATION

| Case Status: | Closed | Status Date | Processing Status | | Arrest Date: | 11/18/2006 |
|---|---|---|---|---|---|---|
| | | 02/01/2007 | Completed | | | |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|

## DEFENDANT INFORMATION

Date Of Birth:          09/01/1960          City/State/Zip: Philadelphia, PA  19132

Alias Name

Strickland, Samuel

Strickland, Samuel D.  Jr

Strickland, Samuel Jr

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Strickland, Samuel D. |

## BAIL INFORMATION

**Strickland, Samuel D.**

**Nebbia Status: None**

| Bail Action | Date | Bail Type | Percentage | Amount | Bail Posting Status | Posting Date |
|---|---|---|---|---|---|---|
| Set | 11/18/2006 | Monetary | | $1,000.00 | | |
| | | | | | Posted | 11/20/2006 |

AOPC 2220 - Rev 11/17/2009

Printed: 11/17/2009

Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial
System of the Common                                                     curate or delayed
data, errors or omission                                                  d check which can
only be provided by the                                                   nal History Record

# COURT OF COMMON PLEAS OF CARBON COUNTY

## DOCKET



**Docket Number: CP-13-CR-0000098-2007**

# CRIMINAL DOCKET

**M3 Disposed by Lower Court**

Commonwealth of Pennsylvania

v.

Samuel D. Strickland

Page 2 of 4

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Date | OTN |
|------|-----------|-------|---------|---------------------|--------------|-----|
| 1 | 1 | M2 | 18 § 4906 §§A | False Report - Falsely Incriminate Another | 11/18/2006 | K5310922 |
| 2 | 2 | M3 | 18 § 4914 §§A | False Identification To Law Enf. Off. | 11/18/2006 | K5310922 |
| 3 | 3 | S | 18 § 3503 §§B1I | Def Tres Actual Communication To | 11/18/2006 | K5310922 |

## DISPOSITION SENTENCING/PENALTIES

| Disposition | | |
|---|---|---|
| Case Event | Disposition Date | Final Disposition |
| Sequence/Description | Offense Disposition | Section |
| Sentencing Judge | Sentence Date | Credit For Time Served |
| Sentence/Diversion Program Type | Incarceration/Diversionary Period | Start Date |
| Sentence Conditions | | |
| Linked Offense - Sentence | Link Type | Linked Docket Number |

**Lower Court Proceeding (generic)**

| | | |
|---|---|---|
| Lower Court Disposition | 01/31/2007 | Not Final |
| 1 / False Report - Falsely Incriminate Another | Dismissed (Lower Court) | 18§4906§§A |
| Lewis, Edward M. | 02/01/2007 | |
| 2 / False Identification To Law Enf. Off. | Guilty Plea (Lower Court) | 18§4914§§A |
| Lewis, Edward M. | 02/01/2007 | |
| 3 / Def Tres Actual Communication To | Dismissed (Lower Court) | 18§3503§§B1I |
| Lewis, Edward M. | 02/01/2007 | |

# COURT OF COMMON PLEAS OF CARBON COUNTY

## DOCKET



**Docket Number: CP-13-CR-0000098-2007**

# CRIMINAL DOCKET

**M3 Disposed by Lower Court**

Commonwealth of Pennsylvania

v.

Samuel D. Strickland

Page 3 of 4

| COMMONWEALTH INFORMATION | ATTORNEY INFORMATION |
|---|---|
| **Name:**    Jean A. Engler, Esq. | **Name:**    W. Thomas Anthony Jr., Esq. |
| District Attorney | Private |
| **Supreme Court No:**    043819 | **Supreme Court No:**    030053 |
| **Phone Number(s):** | **Rep. Status:**    Active |
|    (570) 325-3000    (Phone) | **Phone Number(s):** |
|    (570) 325-0277    (Fax) |    (610) 691-7633    (Phone) |
| **Address:** |    (610) 866-4626    (Fax) |
|    Carbon County District Attorney's Office | **Address:** |
|    Carbon County Courthouse |    U.S. Department of Education - Office for Civil |
|    PO Box 36 |    Rights |
|    Jim Thorpe PA  18229 |    451 Main Street |
| |    Bethlehem PA  18018 |
| | Representing: Strickland, Samuel D. |

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | |
|---|---|---|---|
| 1 | 11/18/2006 | | |
| Bail Set - Strickland, Samuel D. | | | |
| | | | Lewis, Edward M. |
| 1 | 02/01/2007 | | |
| M3 Disposed No Payment | | | |
| | | | Unknown Filer |



# COURT OF COMMON PLEAS OF CARBON COUNTY

## DOCKET

**Docket Number: CP-13-CR-0000098-2007**

# CRIMINAL DOCKET

**M3 Disposed by Lower Court**

Commonwealth of Pennsylvania

v.

Samuel D. Strickland

Page 4 of 4

## CASE FINANCIAL INFORMATION

Last Payment Date:                                      Total of Last Payment: $0.00

**Strickland, Samuel D.**
Defendant

| | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| JCP | $8.00 | $0.00 | -$8.00 | $0.00 | $0.00 |
| ATJ | $2.00 | $0.00 | -$2.00 | $0.00 | $0.00 |
| State Court Costs (Act 204 of 1976) | $9.70 | $0.00 | -$9.70 | $0.00 | $0.00 |
| County Court Cost (Act 204 of 1976) | $27.00 | $0.00 | -$27.00 | $0.00 | $0.00 |
| Commonwealth Cost - HB627 (Act 167 of 1992) | $8.30 | $0.00 | -$8.30 | $0.00 | $0.00 |
| Crime Victims Compensation (Act 96 of 1984) | $35.00 | $0.00 | -$35.00 | $0.00 | $0.00 |
| Victim Witness Service (Act 111 of 1998) | $25.00 | $0.00 | -$25.00 | $0.00 | $0.00 |
| Domestic Violence Compensation (Act 44 of 1988) | $10.00 | $0.00 | -$10.00 | $0.00 | $0.00 |
| Postage | $11.00 | $0.00 | -$11.00 | $0.00 | $0.00 |
| Costs/Fees Totals: | $136.00 | $0.00 | -$136.00 | $0.00 | $0.00 |
| **Fines** | | | | | |
| Crimes Code, etc. | $300.00 | $0.00 | -$300.00 | $0.00 | $0.00 |
| Fines Totals: | $300.00 | $0.00 | -$300.00 | $0.00 | $0.00 |
| Grand Totals: | $436.00 | $0.00 | -$436.00 | $0.00 | $0.00 |

** - Indicates assessment is subrogated